**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **MATT SHERIFF** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **STRYVE FOODS, LLC.** | § | **CASE NO.** |
| *Defendant.* | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Matt Sheriff ("Sheriff" or "Plaintiff"), by and through his counsel, The Hunnicutt Law Firm, files this Original Complaint against Stryve Foods, LLC., ("Stryve" or "Defendant") and respectfully shows the Court as follows:

**I.**
## PARTIES AND SERVICE

1.      Plaintiff Matt Sheriff is and at all times a resident and citizen of the State of Illinois and resides in Port Barrington, Illinois.

2.      Defendant Stryve Foods, LLC is a Texas Limited Liability Company, and can be served through its Registered Agent, Joe Oblas, 6900 North Dallas Parkway, Ste 360, Plano, Texas 75024.

3.      Gabe Carimi is the Stryve Foods, LLC Chief Executive Officer, and can be found at 1951 Thackery Ln, Prosper, Texas 75078.

4.      Ted Casey is the Chairman and a member of Stryve Foods, LLC, and can be found at 1 Abbey Woods Ln, Dallas, Texas 75248.

5.      TJ Humphrey is a member of Stryve Foods, LLC, and can be found at 1777 Prince Williams Ln, Frisco, Texas 75034.

6.      Derek Humphrey is a member of Stryve Foods, LLC, and can be found at 4269 Waterstone Estates Dr, McKinney, Texas 75071.

7.      Joe Oblas is a member and the registered agent of Stryve Foods, LLC, and can be found at 5801 Tennyson Parkway, Suite 275, Plano, Texas 75024.

## II.
## STATEMENT OF DIVERSITY JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper in the Eastern District of Texas, Sherman Division, under 28 U.S.C. § 1332, diversity of citizenship and the amount in controversy is in excess of $75,000. Venue is proper in this Court pursuant to 28 U.S.C. § 1390 and 1391 as a substantial part of the events giving rise to the claims alleged in this matter occurred in the Eastern District of Texas, more specifically, within Collin County. Furthermore, Section 12.2 on page 10 of the June 15, 2018 Restricted Units Grant Agreement ("RUGA"), attached as Plaintiff's Exhibit 7 to this Complaint, states that "the exclusive venue, forum, and jurisdiction [shall be] any state or federal judge sitting in Collin County, Texas.  Plaintiff is a resident of Illinois. Defendant, and members of Defendant, are residents of Texas as listed in Section 1, Parties and Service.

## III.
## FACTUAL BACKGROUND

9.      On or about April 4, 2017 Stryve, via Joe Oblas, COO, tendered an offer letter to Sheriff for employment with Stryve Foods, LLC. The letter offered Sheriff the position of Director of Sales. The stated purpose of the letter was to "assure that there is no misunderstanding regarding major elements of [Defendant's] offer to [Plaintiff]." *See* Plaintiff's Exhibit 1.

10.     Chief among the pertinent components of the April 4, 2017 letter were the following: (1) salary of $175,000, and (2) along with base salary, Sheriff was to be on the "Stryve

Foods Commission Plan", described as a tiered, incentive-based plan with [Plaintiff's] commission percentage correlated with sales profits and the size of the sales team.

11.    Subsequently, on June 15, 2018, Plaintiff Matt Sheriff entered into an agreement, titled the "Restricted Units Grant Agreement" ("RUGA") with Defendant Stryve Foods, LLC. The purpose of this agreement was to provide for additional form(s) of compensation to Sheriff in his capacity as the Director of Sales for Defendant and to provide Sheriff with a grant of Class B units, or shares, of the company.

12.    Sheriff agreed to join Defendant and accepted a below market salary amount, which was, in theory, enhanced by an offer of a 5% deal bonus. The Defendant later asked Sheriff if he would forgo his 5% deal bonus. In consideration, Defendant offered, via representation by, then CEO Gabe Carimi, and Sheriff accepted, a 3% equity stake in the Defendant. Members of the Defendant orally represented to Sheriff the equity stake would "make [him] a millionaire." The equity stake allegedly was represented by issuance of units, or shares, in the Defendant upon execution of the RUGA document. After Sheriff signed the RUGA a specific member of the Defendant asked Sheriff how it felt to be a millionaire, implying that the RUGA held a minimum value of a million dollars.

13.    The units were provided to Sheriff pursuant to a series of exhibits attached to the RUGA each designated as a separate exhibit.

14.    On June 15, 2018, Sheriff received an initial grant of 3,774 Class B units pursuant to Exhibit "1" attached to the RUGA. *See* Plaintiff's Exhibit 7 at 22.

15.    On October 3, 2018, Sheriff was granted an additional, separate grant of 2,226 Class B units. These initial two grants equaled six thousand (6000) units. These units each had a distribution threshold of $21,750,000. *See* Plaintiff's Exhibit 7 at 23. Ted Casey memorialized this

distribution via an email dated May 23, 2019 when he stated that "the number of shares is a nice round 6,000." *See* Plaintiff's Exhibit 5 at 7. Mr. Casey stated further that "the easiest way to describe the [class] B share you had 3% before we had the last funding round and now it is about 2%." The referenced e-mails from Mr. Casey were in response to direct questions posed by Plaintiff prior to agreeing to the "Fourth Amended and Restated Limited Liability Company Agreement of Stryve Foods, LLC." ("Fourth Company Agreement"). *Id*.

16.     On January 1, 2019, Sheriff was granted an additional, separate grant of 2,500 Class B units, for an aggregate total of eight thousand five hundred (8500) units. *See* Plaintiff's Exhibit 7 at 24. Plaintiff asserts that the May 23, 2019 email from Ted Casey addressing Plaintiff's questions failed to include the 2,500 additional shares that were issued on January 1, 2019 with the increased distribution threshold of $49,800,000.00.

17.     Each of the grants listed above contain a "distribution threshold." The distribution threshold was defined as the minimum value of the company which would have to be realized in order for Sheriff's units to have value or sell them back to the Defendant for value.  The grant on June 15, 2018, had a distribution threshold of $21,750,000.  The grant on October 3, 2018 also had a distribution of $21,750,000.00. However, the Notice of Grant issued on January 1, 2019, remarkably had a dramatically increased distribution threshold of $49,800,00.00; more than doubling the distribution threshold within the prior 90 days. *See* Plaintiff's Exhibit 7 at 24.

18.     In addition to the Notice of Grants that were attached as Exhibit "1" and Exhibit "2" to the RUGA, there was a page titled "Signature Page to the Fourth Amended and Restated Limited Liability Company Agreement of Stryve Foods, LLC." That signature page was to be attached to the Third Amended and Restated Limited Liability Company Agreement of Defendant and that agreement, along with the RUGA, constituted the entire agreement and understanding

between the parties. *See* Plaintiff's Exhibit 11 at 101. The Signature Page to the Fourth Amended and Restated Limited Liability Company Agreement of Stryve Foods, LLC, was signed by Sheriff on May 28, 2019. *Id*. However, a week later Defendant had Sheriff sign the Signature Page to the Third Amended and Restated Limited Liability Company Agreement of Stryve Foods, LLC on June 6th, 2019. *See* Plaintiff's Exhibit 7 at 25. Sheriff alleges that ambiguity exists regarding which agreement actually controls and which agreement is, or was at the time, currently active.

19.     Exhibit 3 to the RUGA was titled "Form of Unit Assignment." *See* Plaintiff's Exhibit 7 at 26. This agreement had instructions for Sheriff to sign the Agreement, but to not fill in any of the blanks.  Those blanks were to be used by the Defendant "and/or its grantee(s) to acquire the units upon exercise its repurpose opportunities set forth in the company agreement without requiring additional signatures on the part of the grantee or the grantee's spouse, if any." This agreement was signed by Sheriff on June 6, 2019.

20.     Defendant agreed to pay Sheriff commissions totaling $55,000.00 for 2019. These commissions were to be paid by January 31, 2020. In an e-mail dated October 24, 2019 Joe Oblas, Stryve Co-CEO, confirmed that in Plaintiff's original offer letter, dated April 4, 2017, Defendant intended on building a commission plan. Mr. Oblas did state that "although no plan was ever enacted…I am good with living up to what's been put forth here as we honor our commitments." *See* Plaintiff's Exhibit 4 at 4. In an additional email from Stryve, dated October 24, 2019, Defendant informed Sheriff that "[w]e can target payment by January 31, 2020 at the latest. We will do it sooner if possible, depending on our next capital raise." *Id* at 5.

21.      Defendant, nonetheless, failed to honor its obligations to Sheriff and did not pay the commissions owed to Sheriff even after written demand for the commission was tendered to counsel for Defendant. Additionally, Sheriff incurred $999.00 in valid company related expenses

on his personal credit card. Sheriff submitted this expense for reimbursement, and Defendant has failed to reimburse Sheriff for this expense, as well. *See* Plaintiff's Exhibit 13 at 158.

## IV.   CAUSES OF ACTION

22.     On information and belief, the Defendant is currently attempting to raise at least $25,000,000.00 in a capital investment.  To do so, the Defendant has provided documentation to potential investors asserting that the company's value is in excess of $45,000,000.00. *See* Plaintiff's Exhibit 3 at 3.

23.     In spite of the fact that the Defendant alleges to be worth at least $45,000,000.00 pre-investment, the Defendant has told Sheriff that his class B units are worthless and that if the Defendant were be liquidated, on the date of communication to Sheriff, Sheriff would have a negative share value. *See* Plaintiff's Exhibit 2 at 2.  In a letter dated December 2, 2019, counsel for Defendant stated that as of October 31, 2019 the tangible book value of Defendant is negative $8,119,948.91 indicating that if Defendant were to liquidate on the date of separation, October 25, 2019, the purchase price of [Defendant's] Class B Units is $0.00. See *Id*.

### a.  BREACH OF CONTRACT

24.     Sheriff incorporates the factual allegations from the preceding paragraphs 9 - 23 by reference for this cause of action.

25.     The standard elements of a cause of action for breach of contract include an offer, an acceptance in strict compliance with the terms of the offer, a meeting of the minds, a communication that each party consented to the terms of the contract, and consideration. *See Turner v. NJN Cotton Co*., 485 S.W.3d 513, 521 (Tex. App.–Eastland 2015, pet. denied); *Expro Ams., LLC v. Sanguine Gas Expl., LLC*, 351 S.W.3d 915, 920 (Tex. App.–Houston [14th Dist.] 2011, pet. denied).

26.     Defendant offered Sheriff a compensation package on April 4, 2017 which included a base salary, a commission plan, as well as various other benefits. *See* Plaintiff's Exhibit 1 at 1. Pursuant to both the Fourth Company Agreement and the RUGA, Defendant offered Sheriff an equity share of Defendant as an alleged incentive in the form of the units issued under the RUGA. The RUGA memorialized the agreement between Sheriff and Defendant whereby Sheriff could sell back his shares to Defendant once a distribution threshold was met. There was no time limit or cut off to offer the shares back to Defendant. Defendant also maintained the option in the form of a Repurchase Option to buy back Sheriff's shares. The exponential increase from October 2018 to January 1, 2019 (as reflected in paragraph 17, supra) represented a robust 2019 forecast for the valuation of Defendant. Sheriff's potential value of his own units could reasonably be viewed to dramatically increase in 2019 since the threshold for distribution increased by a factor of greater than two from October 2018. Nevertheless, Sheriff asserts that pursuant to the "Notice of Grant" attached to the RUGA he was issued 6,000 shares between June 2018 and October 2018 for which the distribution threshold was met.

27.     Sheriff elected to voluntarily leave his position with Defendant on October 25, 2019. On or about October 24, 2019, Sheriff exchanged several e-mails with Defendant's members, and support personnel, regarding his departure from Defendant. Sheriff inquired about the core issues of his written agreements with the company, including his units, his commissions and reimbursement(s) for expenses. According to the terms of the RUGA, the distribution threshold should have applied to, and was met for the shares issued in June 2018 and October 2018 based on the increase from $21,750,000 to $49,800,00 from October 2018 to January 2019. On the one hand, Defendant asserts and represents to investors, and by extension Sheriff, that the valuation of the Defendant exceeds at least the 2018 threshold of $21,750,000.00. Defendant is currently

seeking investments and capital based on a valuation of $30 Million to $45 Million based on publicly available news articles.

28.     Defendant has breached all of its contractual obligations to Plaintiff by failing to honor its unit distribution threshold valuation and rendering Plaintiff's units worthless. Defendant has represented to Plaintiff in pre-litigation communications that Defendant has a value of approximately negative $8 Million. On the other hand, Defendant seeks investment based on an alleged valuation of $30 million to $45 million. Defendant refuses to pay contractual value for the Class B units issued to Plaintiff, and, by doing so, Defendant has materially breached its contract with Plaintiff.

29.     Additionally, despite the Plaintiff leading the Defendant through massive growth, increasing the Defendant's total net revenue by over 100% from October of 2018 to October 2019, Defendant has now breached its agreements and all principles of fair and equitable dealing by declaring Sheriff's units worthless and declining to pay any amount under their contract.

30.     Furthermore, Defendant has breached its contract with Plaintiff to remit his contractual commission compensation in the amount of $55,000, which was due to be paid on or before January 31, 2020. Defendant has refused to remit that amount. Defendant has further refused to reimburse Plaintiff for a valid business expense that Plaintiff placed on his personal credit card for $999.00.

## b.  PROMISSORY ESTOPPEL

31.     Plaintiff incorporates by reference all factual allegations in the preceding paragraphs 9 through 30 for use in relation to this cause of action.

32.     Defendant, by way of members and representatives of Defendant, made material written and verbal representations to Sheriff regarding the worth of the Units Defendant issued

Sheriff, and the relative strength of the financial position and health of the Defendant. Members Casey and Oblas made statements to Sheriff regarding how it felt to be a millionaire based on Sheriff's acceptance of Defendant's RUGA. Furthermore, Defendant represented to external investment sources that Defendant purportedly had a value of up to $40 million. Internally, Defendant made specific representations to Sheriff, which Sheriff relied on to his detriment, that his units of shares, issued in June 2018, October 2018 and January 1, 2019 held significant value based on the distribution thresholds. Specifically, the distribution threshold for June 2018 and October 2018 was $21,750,000.00. By raising the distribution threshold to $49,800,000 in January 2019, 90 days from the prior threshold noted in October 2018, Defendant communicated to Sheriff, and any other similarly situated unit holder and/or outside prospective investor, that Defendant attainted the distribution threshold of at least $21,750,000.00 when Defendant elected to raise the distribution threshold to $49,800,000. Sheriff reasonably relied on this increase in the threshold as a statement regarding the increased value of Defendant. Due to the increase in distribution threshold amount, Sheriff relied on the increasing value of his units and relied on that increase for his decision to remain with the company and retain his units as they appeared to increase in value.

33.     Promissory estoppel is a defensive theory that estops a promisor from denying the enforceability of a promise. *Trammel Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 636 (Tex.1997).

34.     The elements of promissory estoppel are a promise that the promisor can foresee will cause substantial, detrimental reliance by the promisee. *See English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983). To show detrimental reliance, the plaintiff must show that he materially changed his position in reliance on the promise. *Miller v. Raytheon Aircraft Co.,* 229 S.W.3d 358, 379 (Tex.App.-- Houston [1st Dist.] 2007, no pet. h.); *see also English,* 660 S.W.2d at 524 (finding

no promissory estoppel when plaintiff could not show that he would not have taken his detrimental actions if defendant had not made the promise).

35.     Sheriff was offered, and accepted, a 3% equity stake in consideration of forgoing his 5% deal bonus. On the one hand, Defendant increased the distribution threshold from $21,750,000 in June and October 2018 to $49,800,000 on January 1, 2019. The clear implication to be drawn from this increase is that the value of the company increased, therefore increased the value and worth of the units granted. Defendant now, as of October 31, 2019 based on an attached letter from December 2, 2019, claims the company is worthless (negative $8,119,948.91) and therefore, Sheriff's equity stake and units are worthless.

36.     Defendant knew its promise, or representation of the value of the units to Sheriff would cause substantial, detrimental reliance by Sheriff. Sheriff did so rely and materially changed his position in electing to retain the units and to remain with the Defendant in reliance on the promise or representation by electing to stay with the company based on the representations of valuation of Sheriff's units by the Defendant and members of the Defendant that the units were worth in excess of $1,000,000.00. Sheriff is now damaged, for which he now complains, that the actions of Defendant caused his units to allegedly hold no value based on the information Defendant elected to provide Sheriff. In contrast, Defendant represents to outside investment that the Defendant has a robust valuation, and, pursuant to trade and news articles related to the capital fund raising campaign for March 2020, Defendant advertises to the public a valuation of up to $45 million.

37.     Therefore, Defendant made material misrepresentations, both publicly and privately, to Plaintiff regarding the strength and value of the units it issued to Sheriff which Sheriff relied upon, in part, by retaining the units, while the purported value of the units allegedly

decreased. Defendants action(s), or representation(s), resulted in damages to Sheriff for the loss of value of the units. Sheriff could have elected to sell his units for market value prior to his departure from Defendant had Defendant not made representations that caused Sheriff substantial and detrimental reliance.

### c.      FRAUD

38.      Sheriff incorporates by reference all factual allegations in the preceding paragraphs 9 through 35 for use in relation to this cause of action.

39.      Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations. These are separate causes of action, but they share the same elements, which are: (1) defendant made a material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury. *Jacked UP, LLC v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017).

40.      However, fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)

41.      According to Sheriff's agreements with Stryve, he was to get a 3% equity stake in Defendant.

42.      Defendant represented to Plaintiff that the company was worth several million dollars after the investment rounds. *See* Plaintiff's Exhibit 3 at 3.

43.     Defendant knew this representation was false. Alternatively, Defendant made these representations without knowledge of the truth.

44.     Defendant clearly intended the representation to be relied upon and for Sheriff to forgo his 5% deal bonus.

45.     Sheriff did so rely on the representations to his detriment and has now suffered injury by being told that his shares are worthless.

46.     Plaintiff was consistently and repeatedly told that his shares were worth over $1.4 million by the founders, most specifically Joe Oblas.

47.     The day Sheriff signed the Restricted Units Grant Agreement, he was asked by Ted Casey, one of the founders, "How does it feel to be a millionaire", implying that the worth of his units were not dependent on the then current liquidation value of the Defendant.

48.     Defendant, and those acting on behalf of Defendant, knew the worth of a 5% deal bonus, as they were actively trying to sell Defendant to a larger conglomerate.

49.     The founders and Defendant misrepresented that an equity deal would be "real money no matter what", intended on inducing Sheriff to give up his deal bonus right before a series of fundraising and potential buyouts.

50.     Defendant knowingly misrepresented materially false information on the value of the equity agreement to induce Sheriff into revoking his 5% sale deal. Defendant intended Sheriff to act on the misrepresentations as to the value of the Defendant and units, and Sheriff justifiably relied and acted upon those misrepresentations.

51.     Defendant, and most specifically Chairman Ted Casey, agreed to a no contingency issuance of shares by removal of Section 6 of the RUGA, titled "Company's Repurchase Option." This was signed and agreed to by all parties. *See* Plaintiff's Exhibit 6 at 8.

52.     Defendant only produced a signature page to Sheriff at the time of the issuance, telling him that he simply had to sign to receive the agreed upon no-contingency issuance of units.

53.     Defendant then knowingly delayed the production of the final, official agreement by several months in order to muddy the specific details through time. Upon presenting the "final, official agreement", although they had eliminated the section of the RUGA which gave Defendant the Right of Repurchase, they covertly left in the first paragraph which states that the RUGA is governed by the Company Agreement, which preserved Defendant's repurchase power. Defendant also left Section 8 of the RUGA in, which also stated that there was a repurchase option, despite representations to Sheriff to the contrary.

54.     Sheriff was repeatedly reassured by the Defendant and its agents that the terms they had agreed to were still in place, that he had "real money", was "a millionaire", and that all language the Defendant now stands upon had been removed as previously discussed with that language removal specifically agreed to by Ted Casey and the other founders.

55.     Defendants knowingly and intentionally had Sheriff sign the agreement in a misleading manner. Defendant only allowed Sheriff to see the signature page referencing the Third Company Agreement (that they had previously discussed and agreed upon) and told him that he "had" to sign it in order to get his units. Despite Defendant, its agents, and Sheriff all being in agreement on the language giving Sheriff his units with no contingencies, Defendant kept the language stating that the Third Company Agreement was binding after getting Sheriff's signature in order to preserve the repurchase power that all involved had agreed upon eliminating, thus protecting the Defendant at the extreme detriment of Sheriff.

56.     When asked about the discrepancy, Defendant represented on multiple occasions that the no contingency agreement was still in place, that Sheriff's units were still worth in the "millions" of dollars, and that his leaving would not matter because he "still had his shares."

57.     Defendant now claims that Sheriff's units are worth $0.00, despite having represented the opposite and intentionally inducing Sheriff to alter his compensation agreement based upon those misrepresentations.

58.     Further, after Sheriff left Stryve, the Defendant agreed to pay Sheriff his 2018 commissions, totaling just under $55,000, by January 31, 2020. *See* Plaintiff's Exhibit 4.

59.     After leaving Stryve, Sheriff's credit card was charged $999.00 for a RangeMe subscription entered into on behalf of the Defendant. Stryve's CFO, Billie Winkle, agreed that it was the Defendant's charge, and Defendants would therefore reimburse Sheriff.

60.     To date, no sums have been paid to Sheriff as promised.

## DEMAND FOR RELIEF

Plaintiff prays that the Defendant, Stryve Foods, LLC be cited to appear and answer this complaint, and that upon final trial Plaintiff be awarded monetary damages against Defendant Stryve Foods, in an amount up to or at least $1.5 million, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate for the causes of action plead and related to the units issued to Plaintiff.  Such other further and different relief, whether preliminary or permanent, legal, or equitable, as the Court deems proper. Plaintiff further prays for an award for the $55,000 commission that Defendant failed to remit to Plaintiff. Plaintiff additionally prays for reimbursement of the $999.00 for the expense reimbursement that Defendant also failed to remit to Plaintiff.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff Matt Sheriff prays that Defendant Stryve Foods, LLC. ("Stryve"), be cited to appear and answer herein and that upon final trial hereof, Plaintiff Matt Sheriff be awarded a judgment against Defendant Stryve Foods and related entities, for the following:

a.  Actual damages in the amount up to or at least $1.5 million;

b.  Incidental and consequential damages as may be shown at trial of this cause;

c.  Exemplary damages;

d.  Costs and expenses of this action;

e.  Reasonable and necessary attorney's fees;

f.  Pre-Judgment Interest as well as post-judgment interest; and

g.  Such other and further relief, whether general or special, at law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

THE HUNNICUTT LAW FIRM

_____

J. Stephen Hunnicutt
State Bar No. 10279510
Steve@Hunnicuttlaw.com
Admin@Hunnicuttlaw.com
Anthony Waddell
State Bar No. 24042105
Anthony@Hunnicuttlaw.com
17330 Preston Road, Suite 100A
Dallas, Texas 75252
Telephone: (214) 3616740
Facsimile: (214) 691-5099
**ATTORNEYS FOR MATT SHERIFF**